Good morning. Ethan Ballow of Coleman & Ballow. I speak for Mr. Nabaie. May it please the Court that I am here to speak on the second trial in the Feretta issue and a quotation attributed to our 16th President, Abraham Lincoln. He is said to have observed that a lawyer who represents himself as a fool for a client. And to that, in this case, perhaps one is tempted to add the corollary that a client who represents himself as a fool for a lawyer. Our country allows an individual that liberty to be the fool when it comes to waiving a right to trial. The Supreme Court, the Sixth Amendment, and this Court's interpretations of those rulings require that three things be shown before that waiver can be accepted. The client has to know the dangers of representation. Someone unschooled in the rules of evidence and court procedure is unlikely to be an effective advocate on his own behalf. The individual also has to know the stakes of the case. What are the maximum penalties he or she might face if he decides to go against the government without the assistance of a learned attorney? Finally, the record must demonstrate that person understands what the charges are, understands the nature of the charges, more than an arraignment, more than knowing what he has been charged with, but understanding them. If a district court assures itself that this individual wants to make this foolish choice, this individual knows these risks and wants to proceed, then he can accept a Feretta waiver and a client can represent himself. In this case, the record is bereft of any showing that Mr. Nabai understood the penalties he faced or the charges he faced in the second trial, and when the Court accepted his Feretta waiver, it erred, and it requires reversal. The government — Kennedy. He knew the charges. He may not have known them more than that. Didn't he know the charges? I thought that he knew the charges. The magistrate court is required to inform the defendant at the initial appearance of the charges against him. Every individual gets that under the Constitution, but that's not the Feretta standard. He has to understand, and the district court has an obligation, to discuss on the record with that individual the charges and their nature such that you can be sure and this court can be sure and the district court can be sure and the public can be sure that this person understands what they're facing. But where did Judge Pegerson go wrong here? I think he went wrong in two ways. I think the focus in the government's first argument is this dilatory basis, and what he did is he went off the record to address a conflict. I'm sorry, Your Honor, did I interrupt? Wait. Are you going to address — because he did find that this was probably a dilatory tactic. No, he did not. He did not. What he did was he — in off chambers he evaluated a conflict issue and he evaluated a request for a continuance, and for the request for a continuance he said three things. He said, one, I am concerned that you are trying to manipulate the system. He didn't make a finding that he was or was acting dilatory as far as manipulation. He said he was concerned about it, and he was concerned that he had complained to his lawyer one month before but did not get new counsel. He noted that he had told the government and Mr. Nabai one month before that he would not continue the trial again and that the government had relied upon that. He had continued it previously. The government was prepared with its witnesses, had objected vigorously to a continuance. And he noted that the time had come for trial, and given all the considerations, he was prepared to go for trial. And then he said, motion for continuance denied. He said, we have crossed that bridge. And then he said, now you have a choice, Mr. Nabai. Would you like to proceed with counsel or would you like to waive your right? And Mr. Nabai said, I want to waive that right. And he said, okay. That is where he erred. What he should have done is looked to United States v. Ballot, different spelling, and said, what must I do in this situation? What he was confronted with was the exact situation this Court addressed in Meeks, giving the defendant the choice, proceed with your counsel, who the Court found could proceed conflict-free, or represent yourself. And once Mr. Nabai said, I want to represent myself, you think he's conflict-free, I disagree. Okay, Mr. Nabai, you are able to make that choice. Let me explain three things to you. That was the mistake, and that's what requires reversal in this case. I think in the rush to go to trial, in that rush to hold to his ruling that trial was going to begin the next day, the Court didn't take the necessary time to review Ballot and to advise the defendant properly. I think that's one of the toughest things in front of a district court is when the day before trial, you have someone come and say, I don't want my lawyer anymore. And then that puts the questions of why the issue wasn't brought up sooner. You have a trial calendar. I think it's tough. And also then, of course, the competing right to make sure that he's advised of his right to an attorney. I understand it's a difficult situation. I also don't think it was so last-minute in this case as far as Mr. Nabai had filed a brief with attachments that was 57 pages long, seeking a trial continuance of 45 days. And so before that hearing, the district court was apprised of the issues, was able to think about what was going to happen on that day to make a determination about how he wanted to proceed and had ample time to review Ballot and to make a determination of what he needed to do based on how he was inclined to rule based on hearing arguments. And so while I am absolutely sensitive to the pressures all courts run, district courts especially. Well, the government, according to the record, the government had flown in an expert witness from D.C. for the trial, right? We have not appealed the court's denial of the continuance. We have never alleged that that was abuse of discretion. That is not before this court. What we, our position is once the judge made that determination and proceeded to give Mr. Nabai the meek's choice, he was obligated upon having the selection be waiver to advise Mr. Nabai of the three forerunner factors. And by not doing so, he erred. The government can't, the dilatory since it does trial continuance, there's no finding by Judge Pragerson that he had, by his actions, waived the right to counsel. So that issue also is not before this court, which leaves the government scrambling for the rare case exception under Erskine, and they can't, they haven't shown it. They cite two things temporarily out of focus. They have no evidence regarding the factors two and three, statutory maxima and understanding of the charges, to show that Mr. Nabai understood them. There's nothing in the record to support that. I understand this week the government's even transcribing the initial appearance in some vain hope that some appearance in 1999 in arraignment can somehow help them meet their burden. And it is their burden, as they admit. But they can't. That arraignment isn't enough. And in any case, four years before, when he was arraigned on two trials, it's not going to be sufficient for this Court to find that that fits in the rare case exception. And I think under Feretta, under Erskine, this Court is bound to reverse the conviction and to remand the case such that Mr. Nabai may determine whether he wants to proceed in pro per or retain counsel or have appointed counsel, as the case may be. So this would – he's already served his prison time for this. He has. And so we would be remanding for him to, if we agree with you, to be advised and – No, no. The conviction is vacated. The conviction is unjust and unconstitutional. The conviction is vacated. The case is reversed and remanded. If the government would like to proceed again with Mr. Nabai, then they could file an indictment and recharge him. I also note – And he could end up with more time. That may well be the case, Your Honor. I would also note that one of the things that was confronting Judge Pragerson, I think at the time, you talk about what the stress is, he had been advised that this case, the second trial, was – Mr. Nabai was offered a no-time deal because of the first trial. Serve and you get time served. The government wanted to get rid of this case. And I'm sure Judge Pragerson couldn't imagine why this person wanted to proceed to trial. And if you gave him this, you know, Sophie's Choice, he would make the non-foolish decision. And so – but I think at this point we have to reverse it. We have to vacate the conviction. When I say we, this Court, and send it back. And if the government would like to proceed again against Mr. Nabai, they'll have that opportunity then. Do you want to address the other case? Thank you, Your Honor. I want to talk first about the poverty evidence in trial number one. The government, in this case, admitted evidence that – and used poverty evidence to argue that Mr. Nabai was guilty of – he had the intent to defraud a bank because he needed money because he missed some rent payments and was in arrears on the payment of a Mercedes-Benz. Suppose we agree with you that that was error. Why is it not harmless error? Well, it's not harmless error because this was a close case. The government's case, it was a short trial. The jury was out for almost as long as the trial itself. The government's rebuttal was longer than their closing argument, hammering poverty evidence as a basis, just like Mitchell. The government's case was based on the testimony of basically a bank employee who said he lied about his name, said his name was Mike, when in fact one of the other co-defendants there was also named Mike and he had referred to him as Mike. This bank employee was fired based on her involvement in this case, as was her supervisor. The jury struggled with this case. There was no direct intent to defraud. Mike Klein's defense was that Mike was in fact the wrongdoer. He jumped bail, ultimately was apprehended post-trial and was convicted. We'll talk about that in a moment. His co-defendant, who Mike Klein said he met that same day, was acquitted in the central district, supporting the notion of Mike Klein's exact defense, which is this guy Mike concocted it. This guy Mike made the counterfeit money. He didn't know. Mike Klein offered into evidence the fact that he had done the same method before. The modality of this crime or the alleged crime at the time was going to a bank. These investors were going to invest in his company, Old Persian Company. He's going to go with them to deposit a check. He has this contract. He has done this before. There was nothing wrong with that. There was nothing hinky about that. He provided that evidence to the government. They checked it out. It's consistent with I don't have an intent to defraud. It's not harmless in this case. The government hammered it and rebuttaled because – exactly because it wasn't – because it was so damning to him. And one of the things, the problem was – But one of the differences between this case, I think, and others is that in this case, he – part of the defense was he was legitimate. He was solid. He was a good businessman. Nope. I know I didn't come in that way, but certainly the implication is there. I disagree. I think the legitimate – I agree. Part of the defense, he asked it to me because he said, as Judge Pragerson said, the defense is saying you're legitimate. You're saying he's a con man. He never says he's successful. He never says he's good. In closing, his lawyer never mentions the contract with Imelda Marcos except to say – actually, I'll give you the quote in a moment. Actually, he doesn't mention the contract with Marcos at all, and he doesn't mention the $800 million. The government doesn't ask to strike the $800 million as that's over the top. He never even mentioned that in his closing argument. He admitted it for the sole purpose of saying this is my modality. The judge, when he admitted it and accepted that representation, then conflated it into, well, you're saying you're successful, too, I guess. It's like why would Bill Gates need to shoplift, and he used that analogy. But that's the judge's error. Mr. Prager. I don't know. You know, I read the examination, and I didn't think it was an unfair characterization of it. I mean, I agree with you. Your client did not use the words that he was a successful businessman. He didn't say he was a good businessman. But his testimony was, it seemed to me, the point of his testimony was to show he was a legitimate, credible businessman, and the portrayal is that it has successful business. Well, I think legitimate and credible I would agree with, and I don't think this evidence goes against it in any way. It was improper rebuttal in any case. He doesn't discuss any of this. The notion that he's missed a couple of car payments, the Court came down and mentioned it the way it did because that argument is relevant of nothing. Everyone in this room could use $125,000, I would assert, and would be happy to see it come their way. But whatever our individual needs are or desires for $125,000 does not necessarily mean we're going to commit a crime today. And that's what the government argued in this case, that his individual need or desire for $125,000 led that, you know, it supports conviction. And under the law of the circuit, it doesn't support conviction. It's prejudicial and should have been stricken, and it hurt him in this case, which is exactly why the government hammered it in its rebuttal. If the Court has questions about that, I'd move on to the only other thing I want to discuss, the third-party culpability and Vallejo, which I know you mentioned. Why does the fact that another defendant ran help you? It helps in the same way of Vallejo. In Vallejo, we have a driver who says they find dope in the car. It's a border bus, says, not my dope. He wants evidence that the former owner of the car busted a similar car in similar circumstances, a similar way to say, I didn't know. This Court finds error not to admit it. The government, of course, is saying, well, just because the owner of the car might have done these other acts doesn't necessarily mean this defendant didn't know there were drugs in the car. Maybe they're in cahoots. It doesn't necessarily exclude the driver of this car. The Court was right. And this Court rightfully said, no, that's not the test. The question is, does it tend to exculpate the defendant? And in this case, misdemeanorized defense was I met one person who was charged with me, Mike, on the day of the crime. This guy, sorry, Mr. Gregory. Mike I had known before. Mike had created the counterfeit documents. Mike had given me the counterfeit documents. Mike was the one who was angry at the bank manager. Mike drove this thing. I don't know. He fooled me. Now, the fact that he fled is conscious of guilt. And he wants to explain to the jury that he had showed up. He had stayed behind. He didn't run. They knew where to find him. They had his 1-800 number. They had his information, the corporation and his initials. It's a bank he has a relationship with. I'm staying here because I know I'm not guilty. I have faith in the system. I have faith in my defense. And the government is just plain wrong. And this guy, Mike, he took off because he's guilty, because he did do it. And, in fact, we know that by the time of this trial, the other co-defendant, Gregory, has been acquitted, which tends to suggest that that defense had merit. And by having the judge determine ---- Was that evidence admitted in the other trial? In the ---- In the one who, the third one who was acquitted. Was the evidence that ---- I wouldn't be able to answer that question, Your Honor. And what I think happened here is the district court weighed the evidence, said it's not, I don't think it's going to acquit you. But that is what Vallejo warned against. And I think the case law, you know, Brannon warned against it. The judge can't insert himself into weighing that evidence. It is relevant. It does tend to exculpate him. It's part of the defense. And it's up to the jury to determine whether that's just mere speculation or whether that's a reason to doubt this case, whether that's a basis to say, yeah, you're right. This guy didn't show up. This guy did jump bail. And you're blaming everything on him. We believe you. And Mr. Nebai lost that opportunity. And I think that's part, I think, there's a cumulative nature here, too, which is these two errors together, I think, affected his ability to mount an effective defense, which neither, I think, are harmless. Unless the Court has questions, I'd like to reserve the remainder of my time. Thank you. We'll hear from the government. May I please the Court, Eric Silber on behalf of the United States, return to the waiver issue first. I think what's important in looking at that issue is to understand, first of all, the context in which this happened. This hearing took place the day before trial and two and a half years after the defendant was indicted, after the Court had repeatedly told the defendant that there would be firm trial dates and actually had been lenient in the past in granting continuances. But a month before this, at the June 4th hearing, it said there will be no further continuances, excuse me, continuances, period. Now, at this hearing, I disagree with the defendant that his client, or defense counsel, that his client made a choice to waive counsel at this hearing. I think what he was insisting at this hearing was that there be a continuance. I think that's part of the problem. I think that's why the Kelm analysis and not the Colloquy analysis applies here, and that's what this Court did in Kelm. It said the Colloquy is designed to aid someone who wants to choose to waive counsel. It's designed to guide them in that process. And what this Court held in Kelm was that that analysis doesn't apply when the defendant doesn't want to waive counsel. Well, what the defendant wants is a continuance and to be dilatory. That analysis doesn't apply. If you look at, for example, what would have happened here had there been a Colloquy, it wouldn't have aided the decision process here. And you know that from what did happen, because when the Court said, you understand there's going to be disadvantages of representing yourself, the defendant's response was, yes, I understand that. I'm not prepared to represent myself. That was why he needed a continuance. The same thing would have happened here if the Court had gone over the nature of the charges. It seems to me one of two things would have happened. If the Court had read in the elements of the offense and said, do you understand that, the defendant, after two and a half years who was demanding a continuance, would say either or likely say either, no, I don't understand that. That's why I need a continuance. That's why we cannot proceed today. Or I do understand that. These are serious charges. I cannot represent myself. You have to give me a continuance. It's essentially an argument of harmlessness for a Feretta violation. I would respectfully disagree, because I believe Kelm said that that analysis, the colloquy analysis, doesn't apply when the defendant doesn't want to waive counsel. It's not harmless error, because you still have to, the defense still has to know what he's doing. But the question in that context where the defendant is demanding a continuance and is being dilatory isn't the same. I mean, in Iowa v. Tovar, the Supreme Court said the inquiry under Feretta isn't the same in all circumstances. When the defendant wants something else, here he wanted a continuance, he didn't want to waive counsel. He does have to be informed generally of the consequences. But it's not the same waiver. They're not appealing. The defendant's not appealing the denial of the continuance. I agree. And that's ultimately the problem here, because it's the continuance. This Court held in Kelm, it's held in Fluitt and Studley and other cases, and those are all cited in Kelm, that the result of denying a continuance can be the defendant has to represent himself or herself. And it's the continuance that caused the decision here, which the defendant isn't challenging. It was denial of the continuance that forced the cause of the course of action here. And it was the defendant's refusal to choose. The Court, the defendant never said at this hearing, I would like to choose to represent myself. I want to do that. I think even after you've had the continuance discussion during this hearing, if the Court said no, if at that point he indicated a desire to actually represent himself, I do think even at that point a regular FREDA analysis would apply under Kelm. I think the problem is even at that point he continues to insist on continuance and doesn't want to waive counsel. And Kelm says that the kind of colloquy analysis doesn't apply in that circumstance. Well, it does not make your case worse, because you're forcing him then to go represent himself when he doesn't want to. I disagree, because Kelm said he has to know that he has a right to counsel. There's no question that he knew he had a right to counsel here. And he had to know the dangers and disadvantages of representing himself. And that was informed him at the hearing. And defendant doesn't challenge an appeal that he didn't understand that. There's a difference, I think, between guiding the process of choosing a defendant who wants to choose and helping them make that determination and informing the defendant of the consequence of a different course of action. Here, waiving the right to counsel is the consequence of his insistence on the continuance. I think you're skipping over a step. I think he – I think that Judge Preterson laid out pretty clearly his options after he denied the continuance. He said, you can have Mr. Vaudenoye, or he can be standpoint by counsel, or you can represent yourself. He said, you have those three choices. And the defendant says, that doesn't – that's not really giving me any choice. I can't have Vaudenoye because of their conflict. That means I have to represent myself. So isn't it at that point, wouldn't the obligation arise for the district court to fully explain all of the consequences of his making that choice? I agree that if he at that point had indicated a desire to represent himself, that despite his dilatory conduct up to that point, that it would have been appropriate to conduct a normal FREDA hearing. I respectfully disagree that that's what the transcript indicates. I think after he's been told that the court will deny continuance, I think what he's saying – and I read this at extra record 99 to 100. What he's saying is, I'm not prepared. Vaudenoye's not prepared. Vaudenoye can't represent me. He's not saying, Vaudenoye can't represent me, so I'm going to represent myself. The court at the end of the hearing has to say, I take it from what you're saying that you intend to represent yourself. And that's the end of the hearing. There's no deliberate choice. The defendant is clear all the way along through this hearing that what he has to have is a continuance, and he's not making the choice. Now, the defendant doesn't challenge an appeal of a voluntariness, and that's a separate issue. And I think it's clear from the record that it was voluntary, what happened here. But the kind of FREDA colloquy – The district court says, I'm going to allow you to make that choice. We're going to go to trial tomorrow, after he says you can represent yourself. That's true, but as he – What would you like to do? He said, you don't give me any choice. Yeah, he's saying you're not giving me a choice, but he's not saying that he wants – he's saying that either choice is not something he wants to make. He's not saying, you're not giving me a choice, so I'm going to represent myself. He's saying I can't do any of these options. I need the continuance. He's continuing to not make the choice, and the FREDA inquiry in that context doesn't come into play. I mean, that's – I mean, are you really saying that you don't have to make a FREDA inquiry under those circumstances? That can't possibly be the law. Let me separate two things out, if I could, for a moment. In Lopez v. Thompson, this Court went through what's called the FREDA colloquy. And in reality, the colloquy itself is just to understand – it's kind of three things that the Court has to go through, and then if the Court doesn't go through the colloquy at the time, the record has to demonstrate it. I have to assure you, having been a district court judge, that that colloquy is something that is considered extremely important to do if you actually have a criminal defendant with serious charges that is standing in front of you and saying, you know, I'm going to represent myself. And that's something that most district courts, judges, take extremely seriously. And it's not something that you don't dot the I's and cross the T's on. I agree if the defendant had been going through and wanting to make a choice here that the Court – I have no doubt that the Court would have gone through the regular FREDA inquiry here. He's in a worse position because your argument is that he's in a worse position because he doesn't have a realistic choice and, therefore, no protections are accorded to him. Well, I don't think it's no protections. I think – let me separate out. In Lopez v. Thompson, this Court held that the colloquy is not required by the Constitution of FREDA. It's something that this Court, as part of its suprazorial power, has imposed to guide the process. So it's not that he's not entitled to anything. That's not what the government's saying. He is entitled to some knowledge. He still has – he should still know what he's doing. But it's not the same thing in this context. That's the point that this Court made in Kelm, is that what's called the colloquy is designed for someone who wants to waive the right to counsel. It doesn't mean he doesn't have to have a general understanding of what's going on. It's just it's not the same understanding in that context. Well, let me interrupt for a second. So are you really arguing here that if a defendant – you claim that he never waived – that he wanted counsel. He never wanted to represent himself. That's right. He wanted a continuance. And so in face of the fact where he asserts his right to counsel and the district court says, all right, we're not – I'm not going to give you counsel, that that can't – that's not a Sixth Amendment violation? Well, it has Sixth Amendment implications. I think what Kelm said in that – and this is very similar to Kelm. In fact, the only difference between this case and Kelm is the length of the way, which is longer here. Kelm said he had to know he had the right to counsel, which clearly is not at issue here. And he had to at least understand the dangers and disadvantages of representing himself, which that's the case here. There's no question. The defendant doesn't challenge that he understood that. But the rest of the colloquy, which is designed to aid someone who wants to make a choice, isn't required in that circumstance. And it's no different, again, what the Supreme Court indicated in Iowa v. Tovar, is everything under this kind of – the kind of Faretto Sixth Amendment analysis depends on context. And one of the contexts is always the conduct of the defendant and what's happening. And in that conduct – in that context, what the court did here complied with the Sixth Amendment because it informed him of the consequence of the course that he was choosing. His course was delay. His course was continuance. This happened in the process of two and a half years of delay in this case. And there's no question if the defendant had showed up at this hearing and said, I want to waive my right to counsel, I'd like to represent myself, the district court would have gone through the regular Fretter inquiry just as you would in every other case. The problem that occurred here was the defendant was insisting on continuance, insisting that he couldn't represent himself. And what the court did was comply with what this court held was appropriate in Kelm. But aside from this, I mean, I think – Well, but that's not the – I mean, I think voluntariness is a different question, whether the forced or not forced is a different question than the colloquy. No, he tried this – well, he tried this case by himself, and he did it at the conclusion based on the fact that he didn't want his lawyer and he didn't get a continuance. But this court has indicated that that's a result of the denial of continuance, which isn't challenged here.  The defendant's either forced to proceed pro se or forced to make an election between an attorney he or she doesn't want and proceeding pro se. So, I mean, that's the result of the continuance itself. And the defendant doesn't challenge the continuance, doesn't challenge the voluntariness. What he's saying is, on top of this, I'm entitled to the colloquy that would apply ordinarily when you're making a – you're wanting to choose counsel. And that's where Kelm disagrees. Kelm says that that colloquy – because the colloquy is from Duglanek. That's where it came from. And the court in Kelm is saying that colloquy doesn't apply. I think, ultimately, it doesn't matter here. I mean, the – Yeah, but in Kelm, too, though, from the record, it was apparent that Kelm understood. And that's what, you know, the record locks here. He understood what the nature of charges are and the potential penalties and everything. Well, I would actually respectfully disagree with that. It could be I'm missing something, but I didn't see any of that in the record in Kelm. What I saw was that he knew he was entitled to counsel and that he understood the dangers and disadvantages of reprimanding himself. Well, what it says here is, moreover, we think it a fair reading of the record as a whole that Kelm understood the dangers and disadvantages of self-representation. He knew he was entitled to counsel yet the record establishes he elected to defend himself with his eyes open. That's exactly right. I mean, I think that's what you're looking at. They're saying they're looking at the entire record and he understood these things. And that's – we can do that in this case, too. We can look at the entire record. I think you argued that. Yeah, I think I did. Well, we can learn from that, right? But only I don't think the record supports it in this case, whereas the judges in this panel seem to think the record did support it. Well, see, that's where I disagree, I guess, is that I think what the court was saying there is not the record supported all three things that were in the colloquy because the court said at the beginning of that discussion of the Sixth Amendment that the colloquy analysis doesn't apply. What the court was saying was that he understood the right to counsel, not disputed here, and he understood the dangers and disadvantages.  And here the record made clear that he understood the dangers and disadvantages of reprieve instead of himself. What it's not – what the defendant argues is not clear is that he understood the rest of what is part of the colloquy. And I think that's where we differ. But I can turn to the record itself on the colloquy or the information that would have been part of the colloquy because I do think the record demonstrates that here. On the nature of the charges, I mean, the defendant got the complaint, doesn't dispute that. And, in fact, the defendant doesn't. You know, if it had simply been even maybe uttering a counterfeit bill, but there's a conspiracy charge in here. And when you – just seeing a conspiracy charge is a little different, really, from being told what the nature of that is. That's true to some extent, although the conspiracy here – his acts that are part of the conspiracy are all the criminal acts that are substantive charges. So this is not like Van Moltke where you had someone who was charged in 47 overt acts, which – part of a conspiracy act, 47 overt acts, five of which involved just meeting or talking to people. This is specifically criminal conduct. I also think, look, it's not just – it's not one document in the kind of set alone here. It's the totality of the record. It's the complaint. It's the indictment. It's the first trial on very similar charges. That was a counterfeiting trial. It involved – it wasn't co-conspirator liability, but it was co-schemer and aiding and abetting liability. You have the PSR that's given that outlines the charges in case number two. You do have some discussion of the record throughout the proceeding of the nature of the charges. And more broadly than you would necessarily have, some of the evidence or some of the people who are going to testify. You have, for example, on May 7, 2001, at Government Section of the Record, page 815, you have the government saying defendant is charged on five or six occasions with providing or selling counterfeit currency. I have five witnesses. These are what some of the witnesses are going to testify to. There's these tapes. You have on even the day of the Ferretti hearing, the government again going through its witnesses. This is at Exeter Record, page 74 to 75, saying we have these witnesses. We're going to call these witnesses. You have Vaudenoye on the date of the kind of hearing in this case, the July 9th date. This is at Exeter Record, page 83. You have him saying, look, this is what the evidence here is that is involved in this case. There's the counterfeit money. There is the tapes that involve the counterfeit money. The co-defendant is going to testify against him, and you have the informant. And I think it's important in the context of this to recognize the defendant throughout the proceedings demanded these tapes. He pointed out, I guess demanded the tapes is not the right word, but he highlighted the tapes. He said these tapes are critical to me, which shows that he understands. These tapes, let me back up and say the tapes of him engaging, providing currency, they're about the currency transaction. He's saying that prior to the July 9th hearing at Government's Exeter Record, page 888, he's saying that at the hearing date itself on July 9th, Exeter Record, page 91 to 92, it's clear from this context that he understands what the charges are. And, in fact, Vaudenoye's, his counsel on July 9th says that at the hearing. He says, I've gone over the nature of the charges in our defenses with the defendant a half dozen times. And in Lopez-Asuna, there was nothing like that where the court said, where the defense counsel said that. All that you had in Lopez-Asuna in which this Court relied to buttress the determination on the presence of advisory counsel was the presence itself. Here you have not only the presence of advisory counsel throughout the prior to kind of the waiver hearing. You have the counsel saying that he actually provided this information. And, no, again, it's important to recognize the defendant didn't challenge after trial when he made a Sixth Amendment claim that he didn't actually understand this and doesn't stand appeal. He didn't actually understand this. What he's saying is what wasn't told to me at the hearing. The StatMax, again, a similar thing. He'd been through the previous trial in this case. He'd gotten the PSR. We know he filed objections to the PSR shortly before trial, which reflected that he had reviewed the PSR. And the PSR had the StatMax for the previous offense, which is the same or higher. I mean, the 513 allegation is a counterfeit check of an organization is the same StatMax as counterfeit currency. It's not surprising. They're similar charges. And bank fraud actually has a greater statutory maximum than conspiracy. So he had that information. He had the trial memo. The trial memo was provided to him, which had the statutory maximums in it. At trial, he asked the co-defendant, how could you come here to court? And this is at Government Extra Director page, I believe, 975. How could you come here today without knowing the maximum penalties you face? Which I think makes clear that he, again, he had advisory counsel. He had counsel. It's not advisory up to that point, but he had counsel all the way up through the date of trial. And I think that it makes clear that he did check into that and knew what it was. And he's never claimed that he was misadvised. This isn't the Erskine scenario where the defendant makes that claim. I didn't. I thought I was looking at really an Erskine, a misdemeanor, because he thought he was facing one year and he thought his guideline range was zero to six. The government's trial memo says three years, but, in fact, it's five years. I mean, it's not that scenario. Again, the defendant has never said he didn't stay in the district court when he made a Sixth Amendment claim and he doesn't stay on appeal. I didn't actually understand what the statutory maximum is. His claim is it wasn't explained to me on the hearing. You're down to about two and a half minutes. Do you want to get to the other trial? Yes. Thank you, Your Honor. Turning to the — Why don't you start with the poverty evidence? I mean, I think it was clearly permissible in this context to allow the cross-examination. As Your Honor indicated, I think the inference that the court was looking at was not just legitimate. It was also successful. I mean, he had multiple bank accounts. He had multiple businesses. He hung out with celebrities. And the court actually made that point. Government section of the record of page 507. Defendant said he hadn't said he was successful, and the court said you're suggesting that you're successful. Well, that was my reading of it, and I thought I didn't see too much wrong with the examination. But then the argument took it in a different direction. That's true. Well, I defend the suggestion it took it in a different direction. I think at a minimum, I don't think the court would have understood that and defendant didn't object, because the court gave the Bill Gates scenario, which is the same thing. When he introduced the evidence, defendant's evidence, he said that's like Bill Gates saying I don't have a motive to shoplift because I'm wealthy. And so I think at a minimum, the court wouldn't have understood that this was different, such that the court had a duty to sua sponte, interrupt closing, and stop this. I also note we're talking about four sentences of closing. This is not the government hammering this home. This isn't Mitchell where the government introduced four witnesses to testify on this. It was the last thing the jury heard. It was not the last thing the jury heard. It wasn't even an important part of the case. As defense counsel indicated, this is a large amount of money, and motive is inherent in $125,000. What this case was about was not motive. The government didn't hammer motive home. What this case was about was whether defendant was believable or not. The court indicated at the post-trial hearings in this that the evidence was strong, and it noted that the jury ultimately didn't believe defendant. But this evidence didn't go to defendant's believability. It wasn't particularly prejudicial like it was in Mitchell when you're dealing with. It wasn't just that he was poor. It was that he was poor and didn't support his family and went on and played basketball. I mean, the court went into a kind of why it was particularly prejudicial there. This is more like Sarno where this court said simply not paying bills isn't inherently prejudicial. So I think even if you reach the kind of, I don't know if it's fair to say it's harmless analysis because the failure to object at closing, which is the complaint the defendant has. Well, does he have to object? He objected when the cross-examination was. But he didn't object because it was impermissible poverty evidence. I mean, he has to state the specific objection at that time. What he's saying is the government changed it. It was admitted on one ground and argued it on a different ground. But he didn't object at poverty evidence at the time it was admitted, and he didn't object at closing. I think this Court's precedent does make clear that he has an obligation to allow the district court to correct it. If he thinks it's a change in the basis in which it was admitted at trial, he has an obligation to object there. And I do think it is a plain error review here. And I think ultimately I don't think it matters because whether it's harmless analysis, the government bears the burden, or prejudice in the kind of plain error context in which the defendant bears the burden, the result is the same here. This isn't particularly important evidence at trial. This isn't what the trial turned on. It wasn't particularly prejudicial. If I could turn to the third-party culpability issue. You're over time now. Are there any further questions? Go ahead. Why wouldn't it be permissible to introduce the evidence of escape, of, you know, running off? Well, I don't think it would be relevant, but I think the ultimate question is whether the Court abuses discretion by not admitting it and particularly not reopening it. And I think if you look, this is different than Vallejo. In Vallejo, I disagree that the government's argument there was that these two people were connected. In fact, what this Court said is the government was wrong to say that there was no connection between these individuals and therefore it wasn't admissible. Vallejo is a classic third-party culpability case in which the government says the defendant did it. Defendant says somebody else did it. But the government isn't saying that there's any kind of a co-conspirator liability between the two. It's one or the other. This is the Stewart scenario in which the government is saying all three of these individuals are involved. And all the defendants showed here, if anything, was that Gorgesian was involved. It doesn't exculpate him in any way. Roberts. Thank you, counsel. Thank you. Mr. Butler. Thank you. I just want to raise a couple of points, if I would. Our claim on the Ferretta claim is that the waiver was invalid. As the Court is well aware, Mr. Nabai, I think, is barred by filing a declaration now to say he didn't understand this, that, or the other thing. We have to go on the record before the district court in our position is it's invalid. It's the same basis that this Court reviewed in Erskine, and it's sufficient to cause reversal here. I also think Erskine has a very important point regarding the government's attempt to fit this in a rare case exception. I'll just read the quote. The absence of a temporal focus for the government's inquiry helps lead it to an erroneous conclusion on the merits. The question, even if the rare case envisioned by Ballot is not, broadly, what the record reveals about Erskine's understanding of the possible penalty throughout the different states of the proceedings, pretrial, trial, and sentencing, but specifically what the defendant understood at the particular state of the proceedings at which he purportedly waived his right to counsel. Even after Erskine, I think the government continues to lack a temporal focus, citing irrelevant information about a different case, and focusing on information he received after he allegedly waived his right to counsel. I don't think it can help them. I also think what the government doesn't get, they say, it's not like Erskine because we didn't make a mistake, he wasn't misinformed. But a close read of Erskine shows exactly what the government's broader problem is. If you look at this case, Erskine, the government, when they misinformed him, the defendant replied, yes, the government says it's six years or three years, but the government gets it wrong, and I know the answer. The defendant asserts he knows the answer, and, of course, the defendant in that case is wrong as well. And what the government doesn't understand is individuals in our society often, defendants in criminal cases, are suspicious of and don't necessarily accept what the government offers as the gospel truth. And that's why the district court needs to make sure that it is ensuring an understanding. I think the government also errs because they confuse Mr. Nebai's access to information with a showing that he understood the information. There's no showing that he ever knew about the penalty, but the argument, he had access to it, it's this general notice. But the law doesn't equate notice with understanding. He obviously had notice of all the criminal laws and all the statutory penalties as a matter of statutory presumptions. But if he read a waiver, it's different, and there's no showing of understanding. The last comment. What you're arguing about is, arguing is that what the district court should have done is to force him to go to trial with an attorney he didn't like. No. I think the Court, up until he made the Meeks choice, was exactly right. I think he said, listen, these are my reasons for denying continuance. I'm rock solid. And so we're not going to have a change. We're going to trial tomorrow. I find you have conflict-free counsel. You are free to use him. If you don't want to use him, I'll have him be standby for you. If you want to elect to make a waiver, it's up to you. Which one do you want to go? I'm not saying a choice can be a choice between two hard things. To go to trial or plead guilty are choices. They're hard choices. They often involve prison on both ends of that choice with different lengths or different possible lengths. But they're choices. They're real. The judge gave him that real choice, as he was supposed to do. And when he elected his choice saying, no, I disagree with you about Vaudenoye, I'm going it alone, he could accept that as long as he then made sure that he understood the nature of the charges and the penalty. And that's where the district court stubbed its toe. The last piece I want to just talk about just briefly is the poverty evidences. He did object, and the objection originally when it came in was relevant. This is irrelevant to anything. I also disagree with the government's characterization. Page 581, the entire page of the excerpts of record, it's actually further into the transcript. It's page 58 of the excerpts, shows the government's argument. It's the full page. The government sits down six pages later or seven pages later. This is at the end of trial. This is the end of the buttle, and they hammer it for a page. It's sufficient in itself to cause reversal in a close case, in a short trial, where the jury deliberated for the length of time it did. And we ask the Court to sustain that objection. Roberts. Thank you, Counsel. Thank you. Cases for are being submitted.
judges: Canby, Thomas, Wardlaw